FILED IN OPEN COURT
U.S.D.C. - Atlanta

MAY 28 2024

KEVIN P. WEIMER, Clerk
By: J. Kelley Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIAN SPERBER | Criminal Information<br><br>No. 1:24-CR-179-MLB |

THE UNITED STATES ATTORNEY CHARGES THAT:

**Count One**
**Conspiracy**
**(18 U.S.C. § 371)**

1. Beginning in or about February 2020, and continuing until in or about March 2021, the exact dates unknown, the defendant, BRIAN SPERBER, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with Edmond Norkus to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and, in so doing, with the intent to defraud, caused interstate wire communications to be made in furtherance of the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

**Background**

At all times relevant to this Criminal Information:

*Relevant Entities*

2. O&M Halyard, Inc., (hereinafter "O&M Halyard") a subsidiary of Owens & Minor, Inc., was a Virginia corporation that maintained its principal place of business in Alpharetta, Georgia, within the Northern District of Georgia. O&M Halyard was a manufacturer and wholesale distributor of surgical and other medical instruments, as well as healthcare and safety equipment, such as personal protective equipment ("PPE").

3. Dukal was a New York corporation that maintained its principal place of business in Ronkonkoma, New York. Dukal was a medical supply and medical product manufacturer of healthcare and safety equipment, such as PPE.

4. The defendant, BRIAN SPERBER, owned a healthcare distributor located in Florida named Ark GBST that distributed PPE on behalf of O&M Halyard. SPERBER also directly or indirectly controlled a number of other corporate entities, including A Rose RE, Ark Medical Solutions, Noahs Rose, Now We R 4, Roses Ark, and Secure Medical Products.

5. Edmond Norkus owned Champion Resources, a logistics company located in Florida that provided logistical services for Ark GBST. Champion Resources also procured PPE for customers largely through its relationship with SPERBER's various companies.

6. Victim A, which was located in New York, was a broker that imported and exported a variety of goods both domestically and internationally. During the COVID-19 pandemic, Victim A sought to procure PPE for hospital and medical institutions.

2

7. Victim B, which was located in Florida, was a pharmaceutical and medical products wholesaler. During the COVID-19 pandemic, Victim B sought to procure PPE for an international healthcare company which was facing a critical shortage of N95 masks and other PPE during the early months of the pandemic.

## Manner and Means

8. The defendant, BRIAN SPERBER, along with Edmond Norkus, engaged in a scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions. Through a combination of falsified invoices, emails, and other documents, SPERBER and Norkus defrauded prospective PPE purchasers out of more than $12 million, much of which they used for their own personal benefit, which included SPERBER's purchase of a waterfront mansion and Norkus's purchase of a condominium in early 2020. SPERBER and Norkus continued their scheme to defraud even though they were well aware that hospital and medical institutions were desperate for PPE, such as N95 masks, as the COVID-19 pandemic raged across the world. After the fraud was uncovered, SPERBER responded by threatening the PPE supplier with a press release falsely accusing the supplier of fraud and by continuing to lie about his misuse of funds.

### *Sperber failed to pay O&M Halyard for previously shipped PPE*

9. Almost as soon as he became an authorized O&M Halyard distributor in September 2019, SPERBER failed to pay for previously shipped PPE. O&M

3

Halyard employees repeatedly told SPERBER that he needed to pay down his outstanding balance in order to remain an authorized distributor. For instance, on December 28, 2019, an O&M Halyard employee sent SPERBER an email telling him O&M Halyard needed $261,000 by the end of the year. By February 2020, O&M Halyard employees told SPERBER that they would no longer distribute PPE through his company if he didn't make timely payments.

### *Sperber and Norkus sent fabricated emails that convinced Victim A to wire over $3 million*

10. Despite being notified that they owed substantial sums of money to O&M Halyard, SPERBER and Norkus sent fabricated O&M Halyard emails and invoices to Victim A that falsely claimed O&M Halyard had an ample supply of N95 masks that was ready to be shipped to SPERBER. As a result of these misrepresentations, Victim A wired $3,144,960 to Champion Resources for the purchase of N95 masks with an expected ship date of February 12, 2020. Norkus used approximately $875,000 of those funds to purchase a condominium in Lauderdale by the Sea, Florida. Norkus then wired $1,865,750 to SPERBER, who used those funds to pay down an outstanding balance of over $1 million on previous orders with O&M Halyard. However, SPERBER and Norkus led Victim A to believe that the funds were being used to purchase new PPE for Victim A. To that end, on February 10, 2020, Norkus sent a text message to Victim A with a fabricated banking statement that falsely claimed Champion Resources had wired nearly $3 million to O&M Halyard.

4

11. By February 13, 2020, Victim A still had not received any PPE and asked Norkus for a status update. In response, Norkus sent SPERBER an email stating, "You need to call me bro I have it set up where we can talk while I'm In front and your acting as Omh It's perfect to get us next level." By February 27, 2020, Victim A still had not received its order of PPE. On that same day, Norkus forwarded an email that SPERBER had purportedly received from O&M Halyard stating, "I want you to understand your order is confirmed…." Shortly after sending the email to Victim A, Norkus forwarded the email to SPERBER and wrote, "What I had to send yesterday FYI."

### *Sperber and Norkus sent fabricated emails that convinced Victim B to send them over $13 million*

12. In early 2020, Victim B entered into negotiations with SPERBER for the purchase of millions of dollars' worth of PPE, including N95 masks. SPERBER and Norkus led Victim B to believe that SPERBER could acquire a substantial amount of PPE from O&M Halyard and Dukal. However, SPERBER had by then been notified by O&M Halyard employees that an order of that size was not possible. Furthermore, Dukal representatives had never confirmed to SPERBER that they could deliver the quantities of PPE that Victim B needed.

13. To convince Victim B into believing they had access to additional quantities of PPE, Norkus displayed pallets of PPE in a warehouse. Victim B thereafter gave a $2.8 million cashier's check to an individual operating on behalf of SPERBER. SPERBER delivered about $1 million worth of gloves to Victim B

5

and promised that the difference would be made up in subsequent orders. On March 31, 2020, Victim B sent an additional $8.25 million to SPERBER for the purchase of N95 masks. Finally, on May 1, 2020, Victim B sent an additional $2.5 million to SPERBER for the purchase of N95 masks.

14. Despite receiving over $13 million from Victim B, and despite being notified that that the hospital and medical institutions were in desperate need of PPE as the COVID-19 pandemic worsened, SPERBER and Norkus sent a series of false and misleading emails, invoices, and messages falsely suggesting that the PPE from O&M Halyard was set to be delivered. For instance, on April 30, 2020, Victim B requested an update on his/her order, to which SPERBER replied, "I expect this to move asap." Then, on May 1, 2020, Norkus—copying SPERBER—forwarded an email to Victim B that had purportedly been sent from O&M Halyard stating, "as discussed yesterday these 4 orders are now shipping." However, SPERBER and Norkus knew this email was fabricated and that O&M Halyard had not shipped Victim B's orders.

15. SPERBER and Norkus also sent fabricated Dukal documents and emails to Victim B purportedly showing that Dukal had an ample supply of N95 masks that was ready to ship. For instance, on May 1, 2020, Norkus—copying SPERBER—forwarded an email to Victim B that was purportedly sent by Dukal employee B.W. with the subject line "Dukal Corp International sales ARK GBST May Allocation." Norkus pressed Victim B on making payments for N95 masks. Victim B immediately wired $2.5 million to SPERBER to pay for the Dukal N95

masks. However, SPERBER and Norkus knew that the forwarded Dukal email was fabricated. In fact, B.W.'s last day at Dukal was April 29, 2020 (two days before the email had supposedly been sent). Additionally, in an email to a Dukal representative on May 4, 2020, SPERBER acknowledged that B.W. "had mentioned the lack of inventory in existence." On May 25, 2020, Victim B emailed SPERBER and asked about the status of the Dukal N95 masks. SPERBER responded by forwarding a fabricated Dukal spreadsheet that falsely listed N95 masks as being available.

### *Sperber used victims' funds to pay down his debt to O&M Halyard*

16. Throughout this timeframe, SPERBER misappropriated Victim A and Victim B's funds. At times, SPERBER used the victims' funds to pay down his outstanding balances with O&M Halyard that had been incurred prior to February 2020. For instance, on April 13, 2020, SPERBER emailed an O&M Halyard employee that "[w]e wired 50k today, I know we had a small invoice coming due this week and we are also trying to expedite as much product as possible to our markets so we are trying to pay down the line so we can continue to work efficiently." SPERBER failed to disclose that these funds had actually come from a prospective PPE purchaser who was expecting a shipment of PPE.

17. On other occasions, SPERBER lied to O&M Halyard employees about payments that he had not actually made. For instance, on June 10, 2020, SPERBER emailed an O&M Halyard employee about a purported payment:

7

"Good morning, it was debited from our acct late Monday and you should have seen it yesterday. I will follow up today at noon or so with you and if it is not in, I will head to the bank." However, SPERBER had not made the payment that he represented to O&M Halyard.

### *Sperber misused funds intended to be used to purchase PPE*

18. Even though SPERBER and Norkus knew that their victims were desperate for PPE as the COVID-19 pandemic worsened, SPERBER and Norkus used a substantial portion of the victims' funds for their own personal benefit. From March 26 to May 4, 2020, SPERBER used over $5.3 million of Victim B's funds to purchase a waterfront mansion in Boca Raton, Florida. For his part, Norkus used approximately $875,000 of Victim A's funds to purchase a condominium in Lauderdale by the Sea, Florida. And throughout the conspiracy, SPERBER used Victim B's funds for a variety of personal and business expenditures, which included renting a private jet, purchasing jewelry, and purchasing food at restaurants.

### *Sperber doubled down on his lies after his fraud is uncovered*

19. By mid-2020, the fraud scheme had unraveled as victims realized that SPERBER and Norkus had not used their money to procure PPE. Yet SPERBER responded by threatening O&M Halyard and by continuing to lie to Victim B about his misuse of funds.

20. Despite knowing that he had personally falsified O&M Halyard documents and records, SPERBER directed his attorney to threaten O&M

8

Halyard with the release of a press release entitled, "Trump-Backed Owens & Minor Committed Criminal PPE Extortion and Fraud, Suit Alleges" if O&M Halyard failed to pay SPERBER a grand total of $184,000,000. SPERBER's counsel sent lengthy documents to O&M Halyard's counsel alleging that SPERBER was the victim of an extortion scheme and was due substantial sums of money as "restitution." Notably, the materials sent by SPERBER's counsel failed to disclose that SPERBER had fabricated O&M Halyard invoices, emails, and other documents.

21. Additionally, despite knowing that he had used a significant portion of Victim B's money to buy his waterfront mansion, SPERBER continued to lie to Victim B about his misuse of funds. In December 2020, Victim B made a series of recorded telephone calls with SPERBER. Victim B explicitly asked SPERBER if his funds had been used to purchase the waterfront mansion. SPERBER claimed that he had used money from the "first" deal (when Victim B had received a partial order of gloves) to purchase the mansion. However, SPERBER adamantly denied using any of the remaining funds to purchase the mansion. SPERBER then and there knew this was false as he had used over $5.3 million of Victim B's funds to buy the mansion instead of to purchase PPE for the hospital and medical institutions.

22. Even after learning he was under criminal investigation, SPERBER initiated a lawsuit against O&M Halyard, falsely claiming—among other things—that he was a victim and that he was entitled to $150,000,000 in damages.

9

Notably, SPERBER's lawsuit failed to disclose that he had falsified O&M Halyard invoices, emails, and other documents, and that he had used Victim B's funds to purchase a waterfront mansion and make other personal expenses instead of procuring PPE for hospital and medical institutions while the COVID-19 pandemic raged across the world.

## Overt Acts

23. On or about the dates listed below, in furtherance of the conspiracy described herein, and to effect the objects and purposes thereof, the defendant, BRIAN SPERBER, committed various overt acts by transmitting the following emails to O&M Halyard employees in the Northern District of Georgia:

| Date (on or about) | Interstate Wire |
|---|---|
| May 26, 2020 | On May 26, 2020, SPERBER sent an email to an O&M Halyard employee stating, "200k was initiated Friday to post to me. I expect it in tomorrow and you will see it following day. Next wk you can expect the balance." |
| May 28, 2020 | On May 28, 2020, SPERBER sent an email to an O&M Halyard employee stating, "I was told by TD bank to expect it in tomorrow and I will alert you of the outbound wire so you can track it." |
| June 2, 2020 | On June 2, 2020, SPERBER sent an email to an O&M Halyard employee stating, "I expected funds to be wired to us on Friday and they were and we are expecting them to post to us tomorrow and we will be forwarding the balance owed to Halyard." |

10

| June 10, 2020 | On June 10, 2020, SPERBER sent an email to an O&M Halyard employee stating, "Hi, it seems there may have been an issue with our etreasury acct, we are new to is since Covid and rarely use it. If they can't release funds today I will deposit a cashiers check at Chase as we have done in the past." |
|---|---|

All in violation of Title 18, United States Code, Section 371.

## Forfeiture

24. The United States Attorney re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 23 of this Criminal Information as if fully set forth herein.

25. Upon conviction of the offense alleged in Count One of the Criminal Information, the defendant, BRIAN SPERBER, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting, or derived from, proceeds traceable to the offense, including, but not limited to, the following:

   a. MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offense alleged in Count One of the Criminal Information.

   a. FUNDS: Cash/currency in lieu of real property located at 311 East Key Palm Road, Boca Raton, Florida 33432 [Asset ID: 21-FBI-002719].

29. If, as a result of any act or omission of the defendant, any property subject to forfeiture:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

RYAN K. BUCHANAN
  *United States Attorney*

*/s/ Alana R. Black*

ALANA R. BLACK
  *Assistant United States Attorney*
Georgia Bar No. 785045

*/s/ C. Brock Brockington*

C. BROCK BROCKINGTON
  *Assistant United States Attorney*
Georgia Bar No. 775084

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181